**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM GOLDSMITH, | : | |
| Plaintiff, | : | CIVIL ACTION NO. 3:21-1402 |
| v. | : | (JUDGE MANNION) |
| NATIONWIDE INS. CO., | : | |
| Defendant. | : | |

**MEMORANDUM**

It is generally wise to be forthcoming with details inquired into by your insurance company while investigating your insurance claim, especially when those details go to the heart of the investigation. In this bad faith insurance claim case, defendant-insurer Nationwide felt Plaintiff William Goldsmith was not forthcoming with key details in its investigation into the alleged theft and arson of his car—such as when Goldsmith last saw the car or the fact that his daughter had been convicted of stealing his car before. Goldsmith says Nationwide denied his claim in bad faith. Nationwide now moves for summary judgment. (Doc. 15). A review of the record reveals Goldsmith has not come forward with sufficient evidence to show that Nationwide lacked a reasonable basis for denying his insurance claim, which is fatal to his bad faith claim. Accordingly, the court will **GRANT** Nationwide's motion for summary judgment of Goldsmith's bad faith claim as follows.

I.      **FACTUAL BACKGROUND**

The following essential, undisputed facts are taken from the parties'

submissions to the extent they are consistent with the evidence in the record.

(*See* Docs. 15–21).

Plaintiff William Goldsmith had an auto policy with Defendant

Nationwide Affinity Insurance Company of America ("Nationwide") insuring

his 2016 Chevrolet Colorado pick-up truck. On the morning of June 20, 2019,

Goldsmith reported that the Pennsylvania State Police ("PSP") had

contacted him and advised that his truck was found burning. Nationwide

opened up a claim and assigned it to ToniMarie Poncebaker, who proceeded

to investigate. Nationwide ran a financial stress search which showed no

indications of recent financial distress on the part of Goldsmith.

A few days later, Poncebaker took a recorded statement from

Goldsmith. Goldsmith stated that he went to bed around 9:00 p.m. on June

19, 2019, and was awakened around 10:00 or 11:00 p.m. by a call from the

PSP advising that his truck had been stolen and was found burning on the

Casey Highway. Goldsmith checked and confirmed he still had both sets of

keys for the truck. He was told to call the Dallas Police Department and make

a report, which he did.

Goldsmith's daughter has a substance abuse problem; Dallas Police asked if she could have taken the vehicle and he told them, "No." Goldsmith stated none of his vehicles had ever been stolen before, neither his daughter nor ex-wife had keys to the vehicle or to his home, and his brother, who lived with him, was at work at the time of the theft. Goldsmith explained further that he never had spare keys made, never lost a key, and still had both original sets of keys. Goldsmith stated there were no drag marks or other evidence in his driveway. He only drove the Colorado on weekends and had driven it on the Sunday before the theft, after which he parked it in the driveway and locked it. Goldsmith did not recall when he had last seen the Colorado. He asked his brother and a co-worker who had ridden home with him on June 19, but neither could recall if the truck was there that day.

Goldsmith purchased the Colorado used about two years earlier. He had considered trading the Colorado a few months earlier for a Dodge Challenger but did not because he could not get the price he wanted. He was current on his car payments, did not have a significant history of claims, and had no prior car fires. He had also recently made his first homeowners insurance claim for a fire in his house heater some six months prior.

On June 25, 2019, Poncebaker contacted PSP and was advised that the vehicle was recovered 45 to 50 miles from Goldsmith's home. The interior

cab had been burned and police had ruled the fire an arson. Poncebaker then logged several concerns with the claim: (1) the vehicle had been stolen and burned; (2) the vehicle was recovered before it was reported stolen; (3) Goldsmith had both keys to the vehicle; (4) the vehicle was equipped with a transponder (meaning in her understanding that it should not operate without a properly coded key); (5) Goldsmith had recently been car shopping and offered the Colorado for a trade; and (6) Goldsmith was unsure if the vehicle was at the house at the time of the theft. The same day, Poncebaker referred the claim to Nationwide's Special Investigative Unit (SIU) and also obtained approval from her manager to get an ignition analysis on the car.

On July 15, Nationwide received Goldsmith's Affidavit of Theft, which lists the date of theft as "6/18/2019–?" rather than July 19 as previously reported to Nationwide. In the same affidavit, Goldsmith swore none of his vehicles had ever been stolen previously.

On July 16, Poncebaker obtained a copy of the police report prepared by the Dallas Police. The report indicated Goldsmith called Dallas police at 10:39 p.m. on June 19 and spoke to Officer Eramo. Goldsmith reported that Trooper Holland had notified him by phone that his Colorado was found on fire along the Casey Highway in Dunmore, PA. Goldsmith said that Officer Holland told him to make a report to Dallas police. Goldsmith said he was

- 4 -

unaware the vehicle was gone, and that he had last seen it that evening at about 5:00 p.m. in his "parking lot." Kimberly Goldsmith, his daughter, was listed as a "person of interest" in the report regarding the theft of the Colorado. Furthermore, Officer Eramo questioned Goldsmith about police records documenting numerous incidents involving Kimberly Goldsmith relating to unauthorized use of his motor vehicle. Officer Eramo asked Goldsmith if Kimberly had possibly taken the vehicle; Goldsmith replied that it "may be possible" but he had not spoken to her in about three months.

Poncebaker called Goldsmith on July 16 and asked about his daughter's use of vehicles. Goldsmith denied that his daughter had ever taken any vehicle without his permission. However, in reality, Kimberly Goldsmith was charged, entered a guilty plea, and was convicted of theft by unlawful taking of Goldsmith's Jeep in 2012.

Nationwide retained an expert, Robby Landis, to perform an ignition analysis on the Colorado. Landis advised Poncebaker the same day that based on his initial analysis, the vehicle was last operated using a properly cut and coded key.

On August 12, 2019, Nationwide's SIU representative took a second recorded statement from Goldsmith. Goldsmith stated the truck's value was essentially equivalent to what he owed the lender. He considered trading it

for a Dodge Challenger but decided against doing so because he "didn't really like it." Goldsmith did not recall when he last saw his truck after parking it. He had both sets of car keys with him in the house, which were the originals and had never been lost or copied. Moreover, Goldsmith has a security system on his property, but the system was not working at the time of the theft. Goldsmith told the SIU representative that the Dallas Police had told him there were reports of his daughter using her boyfriend's or husband's car without permission. Goldsmith did not mention, however, that the police had also mentioned that his daughter had stolen one of his own vehicles in the past. In addition, Goldsmith said there was no broken glass or other evidence in the driveway; but in his deposition he denied having even checked his driveway for debris or drag marks. Lastly, Goldsmith expressed he would "love it to be my daughter" who stole his car because perhaps the consequences would set her straight.

Nationwide visited Goldsmith's home and took photographs of its exterior, observing that it was "questionable how [Goldsmith] would not have noted this vehicle missing on his own property." Nationwide further requested Goldsmith produce his cell phone records and work timecards from June 18 to June 20. Next, Nationwide received the ignition analysis report, which indicated that the catalytic converter, a frequently stolen item,

was still intact. The report also indicated that the vehicle's recovered security systems were operational and there were no indications of any systems bypass. Moreover, the vehicle was last operated with a properly cut and coded key.

Nationwide continued its investigation, asking Goldsmith for additional information, sending Goldsmith's keys to the National Insurance Crime Bureau (NICB) for analysis, and attempting to get in contact with Kimberly Goldsmith. The NICB report revealed that only two keys were ever cut for the Colorado and those were the two keys presented for inspection. No keys had ever been added or erased. The report, however, did not indicate whether either key was used on June 19 when the truck was stolen.

Nationwide then required Goldsmith appear for an examination under oath. At the examination, Goldsmith testified he did not remember where the vehicle was parked when he last observed it before the theft—in front of the house or in the driveway by the garage. Goldsmith conceded that if the truck was parked by the garage, he would have had to walk past it on the day of the theft, since he parks his work truck by the garage when he comes home from work. Goldsmith said he only drives the truck on Sundays, and he believed he last drove and saw the truck on the Sunday before the theft. He stated, again, that he had never before had any vehicle of his stolen, insisting

the information in the police report was totally wrong. With regard to the charge against his daughter for stealing his Jeep in 2012, Goldsmith claimed he gave her the Jeep. Goldsmith also denied telling the police that he had last seen the vehicle at 5:00 p.m. on the day of the theft.

Nationwide personnel conferred together in early November 2019 and decided to deny Goldsmith's claim based on what they believed were material misrepresentations made by Goldsmith during the investigation. Nationwide sent a letter of denial to Goldsmith, which cited Goldsmith's policy's provision concerning fraud and misrepresentation. That provision explains Nationwide does not provide coverage when the insured conceals or misrepresents any material fact in connection with the filing or settlement of any claim.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Turner v. Schering–Plough Corp.*,

901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Aetna Cas. & Sur. Co. v. Ericksen*, 903 F.Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). The court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323–24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see also Celotex*, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that

there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The non-moving party must direct the court's attention to specific, triable facts by "*citing particular parts* of materials in the record." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added); *see United States v. Starnes*, 583 F.3d 196, 216 (3d Cir. 2009) ("Judges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)); *see also DeShields v. Int'l Resort Properties Ltd.*, 463 F. App'x 117, 120 (3d Cir. 2012) ("If factual support for [a plaintiff's] claim exist[s] in the record, it [i]s incumbent upon her to direct the District Court's attention to those facts.").

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23; *Jakimas v. Hoffman–La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

Finally, the court is sitting in diversity resolving a matter of state law in this case; thus, "[i]nasmuch as Pennsylvania law governs this action[,] we

treat Pennsylvania Supreme Court opinions as binding precedent and Pennsylvania Superior Court opinions as persuasive precedent." *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 107 n.2 (3d Cir. 2009).

## III.   DISCUSSION

A bad faith claim under 42 Pa.C.S. §8371 requires the plaintiff to show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy and (2) knew of or recklessly disregarded its lack of reasonable basis in denying the claim. *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 179 (3d Cir. 2011) (citing *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (1994)). The Third Circuit has described "the essence of a bad faith claim" as "the unreasonable and intentional (or reckless) denial of benefits." *Id.* (quoting *UPMC Health Sys. v. Metro. Life. Ins. Co.*, 391 F.3d 497, 506 (3d Cir. 2004)). "Bad faith" in this context means:

> any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (*i.e.*, good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Terletsky*, 649 A.2d at 688 (quoting BLACK'S LAW DICTIONARY 139 (6th ed. 1990)); *see also Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 523 (3d Cir. 2012) ("[M]ere negligence or bad judgment does not constitute bad faith; knowledge or reckless disregard of a lack of a basis for denial of coverage is necessary.") (citation omitted). As such, "an insurer may defeat a claim of bad faith by showing that it had a reasonable basis for its actions." *Fogel*, 656 F.3d at 179 (citing *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 307 (3d Cir. 1995)).

The plaintiff's burden of proof in a bad faith insurance case is significant; it requires evidence "so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." *Id.* (citation omitted). "[T]he plaintiff's burden in opposing a summary judgment motion is commensurately high in light of the substantive evidentiary burden at trial." *Post*, 691 F.3d at 523 (citation omitted).

Here, a review of the undisputed material facts, of which there are many on this record, reveals Goldsmith cannot demonstrate bad faith on the part of Nationwide by sufficient evidence. Nationwide, as the moving party, has demonstrated it had a reasonable basis in denying Goldsmith's claim: namely, that he violated the policy's material misrepresentation provision

when he provided inconsistent statements on the whereabouts of his truck

prior to the theft and, more significantly, that he denied on multiple occasions

that anyone had stolen his vehicle before, even though his daughter had

been previously convicted of doing so in 2012. *See Millard v. Shelby Cas.

Ins. Co.*, No. 3:CV-02-1902, 2005 WL 2035860, at *4 (M.D. Pa. Aug. 24,

2005) ("Pennsylvania courts have long ruled that a violation of the fraud and

concealment provision of an insurance policy . . . serves as a complete bar

to the insured's recovery under the policy.") (citations omitted).

The materiality of this information is plain, especially the information

about Goldsmith's daughter's prior theft. "A misrepresentation is material if

'a reasonable insurance company, in determining its course of action, would

attach importance to the fact misrepresented.'" *Peer v. Minnesota Mut. Fire

& Cas. Co.*, No. CIV.A. 93-2338, 1995 WL 141899, at *10 (E.D. Pa. Mar. 27,

1995) (quoting *Long v. Ins. Co. of N. Am.*, 670 F.2d 930, 934 (10th Cir.

1982)). "A misrepresentation is also material if '[it] may be said to have been

calculated   either   to   discourage,   mislead   or   deflect   the   company's

investigation in any area that might seem to the company, at that time, a

relevant or productive area to investigate.'" *Id.* (quoting *Fine v. Bellefonte

Underwriters Ins. Co.*, 725 F.2d 179, 184 (2d Cir. 1984)). Goldsmith's claim

centered on the alleged theft and arson of his car. A reasonable insurer

would want to know whether the insured had any idea who may have stolen

the car. The fact that Goldsmith's daughter had done so in the past is clearly

something a reasonable insurer would want to know. So, Goldsmith's original

withholding and subsequent dual affirmations that no one had ever stolen his

car in the past could reasonably be considered by an insurer to be a material

misrepresentation.

In Rule 56 terms, then, the burden shifts to Goldsmith to show sufficient

evidence to support a jury verdict in his favor. Goldsmith attempts to meet

his burden by primarily arguing Nationwide conducted an incomplete

investigation. Goldsmith avers Nationwide (1) "is unable to provide any

explanation or even any hint of any explanation for a motive on Goldsmith's

part to either take part or participate in the theft and burning of his truck[,]"

(2) did not attempt to speak with the police or other relevant persons to

"resolve any perceived inconsistencies" in Goldsmith's representations and

(3) did not consider or investigate the fact that the truck's owner's manual

allegedly provided an alternative method for making a key. These arguments

fall well short of Goldsmith's burden of showing bad faith by clear and

convincing evidence.

An insurer is not required to show that "the process used to reach its

conclusion was flawless or that its investigatory methods eliminated

- 14 -

possibilities at odds with its conclusion"; rather, an insurer need only show "it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action." *Cronin v. State Farm Mut. Auto. Ins. Co.*, No. 3:06-CV-1081, 2008 WL 11503863, at *3 (M.D. Pa. May 8, 2008) (quoting *Mann v. UNUM Life Ins. Co. of Am.*, No. 02-1346, 2003 WL 22917545, at *7 (E.D. Pa. Nov. 25, 2003)); *see also Luse v. Liberty Mut. Fire Ins. Co.*, 411 F. App'x 462, 465 (3d Cir. 2011) ("an insurer may defeat a bad faith claim by showing that it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action"). Nationwide has done so here. Nationwide conducted a financial stress analysis, reviewed the police report, contacted the state police, inspected the vehicle, took several statements from Goldsmith, visited and photographed Goldsmith's property, tried to reach out to Goldsmith's daughter, and hired two experts. In addition, it was not unreasonable for Nationwide to rely on the reports of the two experts which provided that the only two keys in existence were the ones Goldsmith had, and that the vehicle was last operated by a properly cut and coded key. Notably, Goldsmith, whose burden it is to prove bad faith at trial, has not come forward with any counter expert to controvert Nationwide's experts.

Moreover, it is not Nationwide's burden to establish a specific motive on Goldsmith's part, or to pursue every conceivable investigatory angle. Instead, the record reveals Nationwide investigation was "sufficiently thorough to yield a reasonable foundation for its action." *Luse*, 411 F. App'x at 465. And Goldsmith has not come forward with sufficient evidence to demonstrate Nationwide lacked a reasonable basis in denying his claim. Accordingly, the court will enter summary judgment in favor of Nationwide.

**IV.   CONCLUSION**

In light of the foregoing, the court will **GRANT** Nationwide's motion for summary judgment. (Doc. 15). Moreover, since the parties have resolved Goldsmith's breach of contract claim in Count I, the court will **DISMISS** that claim with prejudice and direct the Clerk to **CLOSE** this case. An appropriate order follows.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: November 2, 2023**
21-1402-01

- 16 -